## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CHERLENE HARDY, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 02-JEO-1392-S |
| | ) |
| CONGRESSIONAL MORTGAGE | ) |
| CORPORATION; DEMETRIUS PARKS; | ) |
| FLOSSIE MANORA; TAVARES WILLIAMS; | ) |
| ZANATY REALTY, INC.; and CHARLES | ) |
| ZANATY, JR., | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION</u>

This case is before the court on two motions for summary judgment filed by the

defendants Charles Zanaty, Jr. (hereinafter "Zanaty"), and Zanaty Realty, Inc. (hereinafter

"ZRI").  The first motion is a motion for partial summary judgment on the plaintiff's state law

claims (doc. 78) and the second is a motion for summary judgment on the plaintiff's RICO

claims (doc. 97).  Together, the motions seek dismissal of the entirety of the plaintiff's claims

against these defendants.  The court will address both motions herein.

### I.      <u>PROCEDURAL HISTORY</u>

The plaintiff filed her first complaint with this court on June 6, 2002, naming GMAC

Mortgage Corporation, Congressional Mortgage Corporation, American Financial Network, Inc.,

Demetrius Parks, Flossie Manora, and Tavares Williams as defendants to claims of fraud,

negligence, negligent supervision, equitable estoppel, civil conspiracy, alter ego, predatory

lending/unconscionable conduct, and violations of the federal Truth in Lending Act ("TILA") as

well as violations of the Real Estate Settlement Procedures Act ("RESPA").  (Doc. 1).  On

December 3, 2002, the plaintiff requested an extension of time in which to add parties to her complaint, which the court granted, allowing her until January 15, 2003, to add additional parties. (Docs. 24 & 25). On December 20, 2002, the plaintiff and GMAC Mortgage Corporation filed a stipulation of dismissal with the court, releasing GMAC as a defendant in this case. (Doc. 26). Then, on December 31, 2002, the plaintiff filed a motion to amend her complaint (doc. 28), which the court granted on January 8, 2003. (Doc. 29). In her amended complaint, the plaintiff added ZRI as a defendant; omitted her allegations against bankrupt defendant CMC; omitted her allegations against GMAC and American Financial as the result of a pro tanto settlement; omitted her allegations of violations of TILA and RESPA; and omitted her allegations and claims for negligent supervision, equitable estoppel, predatory lending, and unconscionable conduct. (Doc. 31 at pp. 1-2). On January 30, 2003, the plaintiff and American Financial Network filed a stipulation of dismissal with the court, releasing American Financial as a defendant in this case. (Doc. 33).

On May 2, 2002, the plaintiff filed a second amended complaint, amending her allegations against Zanaty Realty, Inc. (Doc. 45). On August 25, 2003, the plaintiff filed her third amended complaint adding Zanaty; adding allegations for breach of contract against CMC, Demetrius Parks, Tavares Williams, Zanaty, and ZRI; and adding allegations of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against CMC, ZRI, Zanaty, Demetrius Parks, Flossie Manora, and Tavares Williams. (Doc. 60).

On April 5, 2004, the plaintiff and CMC, Dee Parks, and Flossie Manora filed a stipulation of dismissal with the court, releasing those defendants from all claims against them. (Doc. 88). Shortly thereafter, on April 21, 2004, the plaintiff and Tavares Williams filed a

stipulation of dismissal releasing him from all claims against him.  (Doc. 90).  Therefore, the remaining defendants in the case are Zanaty and ZRI and the remaining claims are for breach of contract, fraud, negligence, negligent supervision, civil conspiracy, civil RICO, RICO conspiracy, and aiding and abetting.  (Doc. 60).

<u>        **II.**    **FACTS**</u>[1]

The plaintiff, Cherlene Hardy (hereinafter "Hardy" or "the plaintiff"), contacted Congressional Mortgage Corporation (hereinafter "CMC")[2] regarding purchasing a home. (Hardy Dep. at pp. 11-12).[3]  CMC is a mortgage company and also buys and sells houses. (Hardy Dep. at p. 13).[4]

After checking Hardy's credit, CMC contacted Hardy and told her that they had just acquired a house that she might be interested in but could not yet give her a price because it had not been appraised and they wanted to make repairs to it before it was ready to sell.  (Hardy Dep. at p. 16).

Hardy looked at two or three other houses before she saw the house that she ultimately

---

[1]The facts set out below are gleaned from the parties' submissions and they are viewed in a light most favorable to the non-moving party.  They are the "facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2]In 1994, Dee Parks incorporated Presidential Mortgage Corporation, Inc.  Presidential originated and processed HUD mortgage loans.  On September 15, 1999, HUD terminated Presidential's origination authority based on an excessive number of defaulted loans that it had originated.  Less than three months after the HUD termination, Dee Parks's sister, Flossie Manora incorporated CMC.  CMC then applied for and was granted HUD origination authority.  On September 20, 2000, Dee Parks received notification that she was proposed for personal disbarment from participating in any FHA transactions.  On August 21, 2001, the FHA through HUD debarred Dee Parks from participating in FHA loan programs for a period of three years.  CMC employed Dee Parks as its Regional Manager.  (Parks Dep. at p. 55, located at document 104, Tab 14 in the court's record of the case).

[3]Hardy's deposition is located at document 93, tab 1 in the court's record of the case.

[4]Dee Parks also operated a real estate partnership with Tavares Williams called Kingdom Builders.  (Parks Dep. at p. 17).  Parks also operated another company named Parks Construction Company.  (Parks Dep. at p. 44).  When Kingdom Builders sold a house, CMC financed the purchase.  (Parks Dep. at p. 108).

purchased.  (Hardy Dep. at p. 24).  Hardy described the house she purchased as a condemned

house.  Among the problems with the house when she looked at it were: a collapsed bathroom

ceiling; a hole in the wall where an air conditioner had been removed; termite damage to the

wood trim in the third bedroom; plumbing leaks; and roof damage.  (Hardy Dep. at pp. 28-30).

The CMC agent showing her the house told Hardy that it would sell for less than $50,000.00

because houses in the area did not sell for that much.  (Hardy Dep. at p. 31).

Parks told Hardy that they would have the house appraised and then let her know the

asking price for the house and the repairs that were done.  (Hardy Dep. at pp. 17-18).  Hardy

paid $500.00 earnest money in cash for the house.  (Hardy Dep. at p. 21).  Aside from a credit

application, Hardy did not sign any other documents.  (Hardy Dep. at p. 21).

Hardy signed a "For Your Protection: Get a Home Inspection" form[5] that is dated March

22, 2001.  (Hardy Dep. at pp. 108-09; Doc. 93, Tab 2).  The form states:

> ### What the FHA Does for Buyers . . . and What We Don't Do
>
> What we do: FHA helps people become homeowners by insuring mortgages for
> lenders. . . .
>
> What we don't do: FHA does not guarantee the value or condition of your
> potential new home. . . .
>
> That's why it's so important for you, the buyer, to get an independent home
> inspection.  Ask a qualified home inspector to inspect your potential new home
> and give you the information you need to make a wise decision.
>
> ### Appraisals and Home Inspections are Different
>
> As part of our job of insuring the loan, we require that the lender conduct an FHA
> appraisal.  An appraisal is different from a home inspection.  Appraisals are for
> lenders; home inspections are for buyers.  The lender does an appraisal for three

---

[5]Hardy does not recall signing the form but admits that the signature on the form is hers.  (Hardy Dep. at pp. 108-09).

4

reasons:
- to estimate the value of a house
- to make sure that the house meets FHA minimum property standards
- to make sure that the house is marketable

Appraisals are not home inspections.

## Why a Buyer Needs a Home Inspection

A home inspection gives the buyer more detailed information than an appraisal - - information you [need to] make a wise decision.  In a home inspection, a q[ualified] inspector takes an in-depth, unbiased look at yo[ur] potential new home to:
- evaluate the physical condition: structure, construction, and mechanical systems
- identify items that need to be repaired or repla[ced]
- estimate the remaining useful life of the major systems, equipment, structure, and finishes

## What Goes Into a Home Inspection

A home inspection gives the buyer an impartial . . . evaluation of the overall condition of the home . . . items that need to be repaired or replaced.  The inspection gives a detailed report on the condition of structural components, exterior, roofing, plumbing, electrical, heating, insulation and ventilation, air conditioning, and interiors.

## Be an Informed Buyer

It is your responsibility to be an informed buyer. . . that what you buy is satisfactory in every respect.  You have the right to carefully examine your potential new home with a qualified home inspector.  You may . . . do so before signing your contract, or may do so [after] signing your contract as long as your contract states [that] the sale of the home depends on the inspection.

I understand the importance of getting an independent home inspection.  I have thought about this before I sign[ed] [a] contract with the seller for a home.

(Doc. 93, Tab 2).[6]

---

[6]The copy of the document provided by the defendant is illegible along the right hand margin.  The court has noted any illegible words with either an ellipses or text inserted in brackets.

5

The house was on Hardy's way to work so she drove by it every day.  (Hardy Dep. at p. 33).  On one occasion before the closing, Hardy stopped and went into the house.  (Hardy Dep. at pp. 35-36).  Some of the contents of the house were in the yard and Hardy was unhappy because the carpet was gone and the hardwood floors appeared to be damaged.  (Hardy Dep. at 36).  Additionally, the ceiling was damaged and numerous repairs had not yet been made. (Hardy Dep. at pp. 36-39).

Hardy called Dee Parks and complained about the condition of the house.  (Hardy Dep. at p. 40).  Parks told Hardy not to go back to the house because the repairs would be made and that she should not worry because the FHA would not approve the house unless the repairs were made.  (Hardy Dep. at pp. 40-41).  Hardy did not go back to the house until after closing.  (Hardy Dep. at pp. 43-44).

**The Appraisal**

On May 8, 2001, CMC faxed a request for an appraisal with a FHA case number to ZRI. (Zanaty Dep. at p. 35).[7]  Along with the appraisal request, CMC sent Zanaty a copy of a standard real estate sales contract for the property with a sales price of $62,000.00.  (Zanaty Dep. at p. 38; Doc. 80, Tab 2 at PX22).  Zanaty went to the property, sketched it, and made field notes. (Zanaty Dep. at pp. 43-44; Doc. 80, Tab 2 at PX23-24).  Zanaty also checked records on the property from the Jefferson County Courthouse and through the Multiple Listing Service. (Zanaty Dep. at pp. 48-49, 61; Doc. 80, Tab 2 at PX27-28).  Zanaty then prepared an appraisal report dated May 9, 2001, with an appraisal value of $62,000.00.  (Doc. 80, Tab 2 at PX25). Based on his inspection, Zanaty certified that the property conformed to HUD guidelines.

---

[7]Zanaty's deposition is located at document 93, tab 3 in the court's record of the case.

(Zanaty Dep. at p. 71; Doc. 93 at Tab 4).

Zanaty testified that at the time he inspected the house, it was updated and he observed no adverse conditions of the property.  (Zanaty Dep. at pp. 52, 94-99).  The appraisal states:

> The purpose of the appraisal is to estimate the market value of the subject property, as defined in this report, on behalf of the above referenced client as the intended user of this report.  The intended use of the appraisal is to assist the client, as intended user of this report in evaluating the subject property for lending purposes.  The use of this appraisal by anyone other than the stated intended user, or for any other use than the stated intended use is prohibited.

(Doc. 80, Tab 2 at PX25).  The HUD form entitled "Notice to the Homebuyer" that is supposed to be delivered to the buyer states that "Appraisals are different from home inspections.  Home inspections give more detailed information about your potential new home. . . .  You should make sure that you are confident that the physical condition of this property meets all of your expectations."  (Doc. 80 at Tab 3).

### The Closing

On or about June 4, 2001, Ms. Hardy received a phone call telling her that the closing on the house would be the next day.  (Hardy Dep. at p. 45).  Hardy went to the CMC office and met with a closing attorney and Dee Parks.  (Hardy Dep. at pp. 49-50).  Hardy asked about the house and Parks told her that everything was okay.  (Hardy Dep. at p. 52).  At the closing, Parks told Hardy the purchase price would be $60,900.00, and Hardy was surprised because she did not think that houses in that neighborhood sold for that amount of money.  (Hardy Dep. at pp. 53-54).  Parks told Hardy to trust her, so Hardy did.  She took Parks's word for it and signed the documents because she wanted to get the closing over with.  (Hardy Dep. at pp. 51-55).

Hardy did not see an appraisal of the property at the closing.  (Hardy Dep. at p. 57).  Hardy asked for a copy of the appraisal after the closing but was never given one.  (Hardy Dep.

at pp. 56-57).  Hardy did not see a copy of the appraisal until her deposition in this case.  (Hardy Dep. at pp. 58-59).

After closing, Hardy went to the house and observed that interior doors had been replaced, a hole in the wall was poorly patched, the ceiling had a crack in it, the hardwood floors had been painted, the back door had termite damage or rot, and the house had not been cleaned. (Hardy Dep. at pp. 68-73).  Although the kitchen floor had been replaced, after living in the house for some time, Hardy noticed the floor was damaged when she put heavy items on it. (Hardy Dep. at p. 73).  Hardy did not go into the crawl space at first, but when she did, she found standing water in the crawl space.  (Hardy Dep. at p. 77).  Additionally, although there were visible signs of roof repair, the roof leaked and Hardy had to spend $3,700.00 to repair the roof. (Hardy Dep. at pp. 78-84).

**Hartley Appraisal**

_____Plaintiff's counsel hired an appraiser, Gregory Hartley, to appraise the subject property in connection with this lawsuit.  (Hartley Dep. at pp. 7-8).[8]  Hartley opined that as of June 1, 2001, the property had a market value of $43,000.00.  (Doc. 93 at Tab 21).  Hartley further found that: the framing/walls/ceiling had significant water damage; the crawl space had significant dampness or ponding of water; there was evidence of deterioration of roofing materials; electrical switches did not turn on and off, outlets did not function, and there was exposed wiring visible in living areas; there were multiple broken windows and steps without handrails; and there was evidence of lead based paint on the exterior and interior of the house.  (_Id_.).  Hartley then noted that the "current full/market assessed value" of the house was $47,700.00, and

---

[8]Hartley's deposition is located at Doc. 93, Tab 19 in the court's record of the case.

estimated repair costs at $9,000.00.  (*Id.*).

**Charles Zanaty & HUD**

In October 2000, HUD performed an Appraisal Quality Assessment on Zanaty's appraisal of a particular property.  (Doc. 93 at Tab 17).  Based upon HUD's assessment, Zanaty's appraisal was found to be unacceptable.  (*Id.*).  HUD provided Zanaty with an opportunity to respond to the assessment.  (*Id.*).  On July 16, 2002, HUD notified Zanaty that it intended to remove him from the FHA Appraiser Roster after a field review of several of his appraisals revealed the following: neighborhood boundaries not provided; inaccurate description of improvement; specific data on comparables incomplete or inaccurate; required comments regarding bracketing of square footage, comparables over one mile away and adjustments exceeding guidelines not provided; failure to accurately report all readily observable property defects; no analysis of current agreement of sale provided; comparables have sold dates that exceed one year; adjustments not adequately explained or not provided; and estimate of market value not supported.  (Doc. 93 at Tab 16).

On August 26, 2002, Zanaty responded to HUD that he declined a phone conference regarding their review and requested that he be removed from the HUD appraiser roster.  (Doc. 93 at Tab 23).  Thereafter, on September 6, 2002, HUD notified Zanaty that it found that his appraisal reports were in violation of FHA guidelines and affirmed a roster removal sanction of one year.  (Doc. 93 at Tab 15).

**HUD and the Homebuyer Protection Plan**

In 1999, HUD introduced the Homebuyer Protection Plan.  (Hereinafter "HPP").  (*See* Doc. 93 at Tab 6).  The HPP required that defects found by the appraiser be reported to the

purchaser.  (Doc. 93 at Tab 6 at 5-3 C.  Part I: Homebuyers Summary).  HPP 4150.2(5-3)(C) requires that a Homebuyer Summary be provided to the homebuyer to "protect the homebuyer by informing him/her of any material conditions that typically make the property ineligible for FHA mortgage insurance."  If, during an appraisal, the appraiser finds certain problems noted on the forms required by HUD, the problems must be corrected before closing for the mortgage to be eligible for FHA mortgage insurance.  The HPP further provides:

> Appraisals performed for HUD/FHA are not intended to protect the buyer: they protect HUD.  Many homebuyers mistakenly believe that a HUD appraisal and subsequent inspection is a guarantee that the property is free from defects when, in fact, the appraisal only establishes the value of the property for mortgage insurance purposes.  Buyers need to secure their own home inspection through the services of a qualified inspector and satisfy themselves about the condition of the property.

(Doc. 93 at Tab 6 at 4150.2 (5-1)).

## III.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id*.).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### B.      Statute of Limitations

The defendant, Zanaty, argues that the plaintiff's claims of fraud, negligence, and conspiracy against him, individually, are barred by the statute of limitations. (Doc. 79 at pp. 23-24). The plaintiff filed her original complaint on June 6, 2002. (Doc. 1). However, the

plaintiff did not add Zanaty to the complaint until her third amended complaint, which she filed

on August 11, 2003.  (Doc. 60).  The plaintiff's cause of action accrued on or about June 6, 2001,

when she closed on the property at issue in this case.

The court must, therefore, determine whether the plaintiff's claims against Zanaty,

individually, are barred by the statute of limitations or whether the plaintiff's amendment adding

Zanaty to the case relates back to the filing of her original complaint.  Alabama Rule of Civil

Procedure 15 provides that:

> **(c) Relation Back of Amendments.**  An amendment of a pleading relates back to
> the date of the original pleading when
>
> (1)  . . .
>
> (2) the claim . . . asserted in the amended pleading arose out of the conduct,
> transaction, or occurrence set forth or attempted to be set forth in the original
> pleading . . . , or
>
> (3) the amendment . . . changes the party . . . against whom a claim is asserted if
> the foregoing provision (2) is satisfied and, within the applicable period of
> limitations . . . the party to be brought in by amendment (A) has received such
> notice of the institution of the action that the party will not be prejudiced in
> maintaining a defense on the merits; and (B) knew or should have known that, but
> for a mistake concerning the identity of the proper party, the action would have
> been brought against the party. . .

The plaintiff argues that Zanaty will not be prejudiced by being added to this action and that he

was put on notice of the lawsuit when he was served with the original complaint.  The plaintiff

further asserts that "[h]e was the individual appraiser upon whose actions, including signature,

the original complaint was based."  (Doc. 92 at p. 29)  Yet the plaintiff offers no explanation for

why she failed to add Charles Zanaty, Jr., as a party until after the expiration of the statute of

limitations.

The court finds ARCP 15(c) inapplicable to the instant case.  It expressly provides a

vehicle by which a party may *change* a party against whom a claim was made when the identity of the party whom he wishes to add was not known at the time the claim was brought. Such is not the case here. The court finds that the state law claims, as they apply to Zanaty are barred by the statute of limitations and are due to be dismissed.

### C.      Breach of Contract[9]

ZRI argues that it did not have a contract with the plaintiff, and thus, the plaintiff cannot sustain a breach of contract action against it. (Doc. 79 at p. 5). The plaintiff argues, however, that the defendant is liable to her under a third party beneficiary claim. (Doc. 92 at p. 8). In support of her argument, the plaintiff offers the following language from the HUD Handbook:

> The appraiser is hired by the lender, and therefore has a contractual responsibility to the lender. However, the appraiser provides services for HUD programs, and therefore, has an obligation to perform these services commensurate with the standards and requirements of HUD. This dual responsibility of the appraiser is recognized in the review and reporting requirements of HUD. The lender and the appraiser must meet their respective obligations as prescribed by HUD/FHA. Therefore, the intended user of the appraisal report is also HUD. These contractual obligations to the lender and HUD/FHA are in addition to the appraiser's legal obligations to his or her credentialing state.

(Doc. 92 at p. 9 quoting HUD Handbook 4150.2 § 1-2(B)). The plaintiff attempts to persuade the court that this section creates a third party beneficiary relationship between the appraiser and the borrower. Specifically, the plaintiff conclusorily states that the "legal obligations [the appraiser has] to his or her credentialing state" include those obligations to third party beneficiaries. (Doc. 92 at p. 9). The court is not so persuaded. Instead, the court finds it more likely that the quoted language in the HUD provision refers merely to any licensure or credentialing requirements that the appraiser's state might have. Contrary to the plaintiff's

---

[9] The plaintiff stipulates that the breach of contract action against Charles Zanaty, Jr., individually, is due to be dismissed. (Doc. 92 at p. 11).

argument, the HUD provisions specifically state that "Appraisals performed for HUD/FHA are **not** intended to protect the buyer: **they protect HUD**." (Doc. 92 at Tab 6, HUD Handbook 4150.2 § 5-1(emphasis added)).

Regardless, the plaintiff argues that the defendant intended to bestow a direct benefit upon her; that she was the intended beneficiary of that benefit; and that the contract was breached. The plaintiff further argues that "all parties involved knew that an appraisal was required to close the HUD Insured Mortgage of Ms. Hardy, and that home buyers are a third party for whom the contract between CMC and Defendants is intended to bestow a direct benefit." (Doc. 92 at p. 10).

Under Alabama law, "it has long been the rule . . . that one who seeks recovery as a third-party beneficiary of a contract must establish that the contract was intended for his direct, as opposed to incidental, benefit." *Mills v. Welk*, 470 So. 2d 1226, 1228 (Ala. 1985), citing *Anderson v. Howard Hall Co.*, 179 So. 2d 71 (Ala. 1965). To determine whether the contract intended to bestow a benefit on the plaintiff, the court must look to the underlying agreement - - in this case, the appraisal. *See H.R.H. Metals, Inc. v. Miller*, 833 So. 2d 18 (Ala. 2002).

The appraisal does not contain any language indicating that the parties intended to bestow a direct benefit upon the plaintiff. Her argument that the transaction could not have occurred without the appraisal indicates, at best, an incidental benefit. In fact, had the deal fallen through with the plaintiff, CMC likely would have used the same appraisal for a subsequent purchaser. The plaintiff has failed to show "that the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party" as she is required to do in order to establish a third-party beneficiary claim. *See Blu-J, Inc. v. Kemper C.P.A. Group*, 916

14

F.2d 637, 640 (11th Cir. 1990).  Therefore, summary judgment on the breach of contract claim is

due to be granted.

### D.    Fraud

The plaintiff claims that the defendants misrepresented the value and condition of the

house in the appraisal report.  To state a claim for fraud, the plaintiff must show that the

defendant made a false representation to her of a material existing fact on which she reasonably

relied and which proximately caused her injury.  *Boackle v. Bedwell Const. Co., Inc.*, 770 So. 2d

1076 (Ala. 2000).

In support of her argument that the defendant made a false representation to her, the

plaintiff alleges that:

> Before going to the closing, [she] was told that the price would be determined by
> the appraiser. []  However, [she] was under the impression that the house would
> sell to her for $50,000.00. []  In addition, [she] was told by CMC that the loan
> could not close unless the condition of the house was approved by a HUD
> inspector. []  [She] also testified . . . that, had she known that the house was not
> worth more than $60,000.00, she would have looked for another house. []
>
> Defendants knew that [she] was entitled to, at least, a Notice to
> Homebuyer. []  Defendants knew the price CMC and the seller wanted to get for
> the house, because they had a copy of the sales contract [].  Although the house
> was not worth that price, Mr. Zanaty manipulated his appraisal to reach the
> highest price possible. []  Mr. Zanaty manipulated the price by failing to address
> defects in the house, which HUD regulations required him to report. []  In
> addition, Mr. Zanaty selected, or "cherry picked", the comparables to support an
> inflated value. []  This practice of "cherry-picking" comparables was not new for
> Mr. Zanaty, who inflated the value of other homes he appraised for CMC with
> inaccurate comparables and unreported defects.  []
>
> As to the condition of the house, [she] received at the closing a form
> entitled "For Your Protection: Get a Home Inspection" wherein the statements are
> made that the lender does an appraisal "to make sure that the house meets FHA
> minimum property standards" and that "we require the lender conduct an FHA
> appraisal". []  Everyone involved in the transaction knew that Defendants would
> make representations that would pass through to the buyer and that based upon

those representations the loan would close.  Plaintiff has provided extensive
evidence that these representations of Defendants were false.  Based upon these
facts, a fair-minded jury could determine that Defendants' statements were
misrepresentations to the buyer.

. . .

Furthermore, Defendants made misrepresentations intended for the
Plaintiff in the Notice to Homebuyer.  Defendants claim that because the Plaintiff
did not receive this Notice to Homebuyer, Defendants' comments in the Notice to
Homebuyer were not misrepresentations.  Plaintiff disagrees.  The evidence has
shown that, at the time Defendants filled out the Notice to Homebuyer, they knew
and intended that those comments be made to the Plaintiff.

(Doc. 92 at pp. 12-14).  The defendants respond that they never made any representation to the

plaintiff at all.  (Doc. 100 at p. 4).  The court agrees.  The defendants never made any direct

representations to the plaintiff, and the plaintiff testified that she never saw a copy of the

appraisal report, even at the closing.  Based upon the evidence before the court, the court cannot

find sufficient evidence to support the plaintiff's contention that the defendants made a

misrepresentation to her.  As such, the plaintiff's fraud claim is due to be dismissed.[10]

---

[10]Had the defendants made a false representation to the plaintiff, the court might have held that the plaintiff had put
forth sufficient evidence of fraud to go before a jury.  While the defendants argue that their determination of value is not a
material fact and that the plaintiff never saw the Notice to Homebuyer so any omission on that form as to the condition of the
house could not be material, the court disagrees.  (Doc. 79 at pp. 7-8).  In support of their argument, the defendants rely primarily
on *Brushwitz v. Ezell*, 757 So. 2d 423 (Ala. 2000).  In that case, the purchasers sued the appraiser of the home they purchased,
among other parties, when they discovered termite infestation that the appraiser had not noted on his appraisal of the property
prior to their purchase.

In determining whether the plaintiffs could sustain a fraud claim against the appraiser, the Alabama Supreme Court
found no evidence that the appraiser made a misrepresentation of material fact.  To the contrary, the court found that the
appraiser simply placed a value on the home and made no guarantees as to the condition of the home.  Furthermore, the plaintiffs
signed a disclaimer that stated that "the appraisal was not performed for the purchasers to use in determining the value of the
house, but was performed for the lender."  757 So. 2d at 430.  Additionally, the disclaimer stated that the appraisal did not
guarantee that the house was free from defects.  The appraiser testified that he did not see any evidence of termites during his
appraisal of the property.  *Id.*

While the Alabama Supreme Court found that the plaintiffs failed to establish a fraud claim, this court finds that the
facts of the *Brushwitz* case are distinguishable from the facts of the instant case for many reasons.  First, the Brushwitzes failed
to present any evidence that the appraiser neglected to follow ordinary appraisal procedures or that the termite damage was
present at the time of the appraisal, and thus there was no misrepresentation of a material fact.  In the instant case, the plaintiff
presented the expert opinion of Gregory Hartley that "Zanaty's failure to note limiting conditions (defects and/or repair
conditions) created a misleading appraisal report and fell below the standard of care for an appraiser and was also a direct
violation of USPAP Ethics and Standards Rules" and that "the subject property was overvalued . . . .  Inappropriate comparable

16

### E.    NEGLIGENCE

The plaintiff next argues that the defendants:

> [N]egligently or recklessly performed and then reported an appraisal and Homebuyer Summary of Plaintiff's property. . . .  The Homebuyer summary and the appraisal negligently or recklessly omitted readily observable adverse limiting conditions.  The conduct of ZRI and Zanaty fell below the standard of care for appraisers and as a proximate and foreseeable result Plaintiff was damaged.

(Doc. 60 at ¶ 29).  In order to establish negligence, the plaintiff must show (1) a duty to a foreseeable plaintiff; (2) breach of that duty; (3) proximate causation; and (4) damage. *Brushwitz v. Ezell*, 757 So. 2d 423 (Ala. 2000).  The defendants assert that they owed no duty of care to the plaintiff because it prepared the appraisal report for CMC, not the plaintiff. Additionally, the defendant argues, the report included disclaimers of liability.  (Doc. 79 at pp. 12-18).

The Alabama Supreme Court has expressly held that an appraiser can be liable to a third-party for negligence in preparing an appraisal.  *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 461-63 (Ala. 2000).  Specifically, the court reasoned that:

> *Restatement* [(*Second*) *of Torts*] § 522 [(1977)] reads as follows:

---

sales combined with disregard for the repair items necessary to bring the subject property up to even average condition for the neighborhood caused Zanaty to arrive at an unrealistic fair market value."  (Doc. 93 at Tab 18).

The *Brushwitz* court also found that the Brushwitzes failed to put forth any evidence that they reasonably relied on the appraisal. *Brushwitz*, 757 So. 2d at 430.  To the contrary, the court found that "Ron Brushwitz read government contracts for a living, and Faye Brushwitz had been a real-estate agent and was familiar with the process of buying and selling a home.  The plaintiffs were fully capable of reading and understanding the document containing the disclaimer.  Any reliance on them by the appraisal would have been unreasonable." *Id.*  Although the Brushwitzes argued that they relied on the appraisal and decided to buy the house based on the appraisal, they could not say for sure when they received or read the appraisal.  The disclaimer that the Brushwitzes signed explicitly stated that it was not an evaluation of the condition of the house and that the purchaser should not use the disclaimer to determine the value of the house.  Instead, it was to be used by the lender to determine whether the house was sufficient to secure payment of the loan the Brushwitzes were seeking to obtain.  Although in the instant case, there is no evidence that the plaintiff was at all savvy with contracts or with purchasing a home, the court nonetheless finds it unreasonable that the plaintiff could rely on a document she never saw.  The plaintiff testified that she relied on what she was told by Dee Parks and CMC throughout the purchase and that she understood that the loan would not go through without the appraisal.  Based on the evidence before the court, the fraud, if any, was committed by Dee Parks and CMC.  The plaintiff has not presented sufficient evidence against Zanaty to sustain a fraud claim.

(1) One, who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or shows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Fisher*, 772 So. 2d at 461.  While the court had never applied the *Restatement* rule to an appraiser before *Fisher*, it noted that it "may be applied to anyone who in the course of his 'business, profession or employment' engages in an activity that meets the requirements set forth in subsection (1)."  *Id*. at 462.  The court went on further to state that:

Comment c to § 552 states that this rule "subjects to liability only such persons as make it a part of their business or profession to supply information for the guidance of others in their business or transactions."  Section 552 would clearly, by its terms, govern real-estate appraisers, who, as an integral part of their business, facilitate real-estate transactions by issuing opinions regarding the value of real property.  These opinions usually influence the decisions of persons or entities to whom they are furnished.  These persons or entities include banks considering whether to lend money to finance a real-estate purchase and buyers and sellers trying to determine an accurate price for real-estate.  We therefore hold that real-estate appraisers are subject to liability for negligent or wanton misrepresentation. . . .

18

*Id.*[11]

Noting that the *Restatement's* definition of "duty" limits liability to "'specifically foreseen and limited groups of third parties for whose benefit and guidance the [defendant] supplied the financial information and who used it as the [defendant] intended it to be used,'" *Fisher*, 772 So. 2d at 462 (quoting *Boykin v. Arthur Andersen & Co.*, 639 So. 2d 504, 510 (Ala. 1994), the court went on to say that:

> [t]he *Restatement* rule, if applied to appraisers generally, would impose on an appraiser a duty to third parties that the appraiser intended to influence, as well as any party that the appraiser knew his client intended to influence by means of the appraisal. (citation omitted). The *Restatement* rule, however, does not require, for the imposition of a duty, that one making a representation through a report or appraisal contemplate the specific identity of the person who may rely on the representation.

*Id*. As such, the court must address whether ZRI "foresaw or should have foreseen" whether Hardy would rely on its appraisal. ZRI performed the appraisal for CMC. Although the plaintiff's expert opined that:

> Hardy was an intended user [] because HUD clearly outlined the time frame in which the borrower or purchaser was to receive the Notice to Homebuyer, completed by the appraiser and made part of the appraisal report of the subject property, that set forth defects and/or repair conditions related to the subject property[.]

(Doc. 93, Tab 18, at ¶ 4), the court disagrees. The evidence is insufficient to meet the *Fisher* standard that the third party be a person the appraiser intended to influence or a third party the client, CMC, intended to influence by means of the appraisal. *Fisher*, 772 So. 2d at 462. To the contrary, the record indicates nothing supporting such a conclusion.

Instead, the same HUD guidelines that provide that "[t]he Homebuyer Summary intends

---

[11]The defendants state that the plaintiff has ignored *Brushwitz*, which is controlling. The court disagrees. *Fisher* controls the specific matter of whether a duty exists. *Brushwitz's* unsupported statement that no duty exists is not controlling.

to protect the homebuyer by informing him/her of any material conditions that typically make

the property ineligible for FHA mortgage insurance," specifically state:

> D.     INTENDED USE OF THE APPRAISAL/FUNCTION
> (4-1)   The intended use or function for all appraisals prepared for FHA is to
> support the underwriting requirements for an FHA-insured mortgage.
>
> E.     USE OF THE APPRAISAL
>         The use of the appraisal is to support FHA's decision to provide mortgage
> insurance on the real property that is the subject of the appraisal.  Therefore,
> **intended users include the lender and HUD.**

(Doc. 93, Tab 6 at 4150.2 (4-1) (emphasis added)).  4150.2 - 5 also provides that "accurate and

thorough appraisal reporting is **critical to the accuracy of underwriting for the mortgage**

**insurance process**" (5-0) and requires that the appraiser submit the completed appraisal report

to the lender (5-1).  Finally, the HUD guidelines explicitly state that:

> Appraisals performed for HUD/FHA are not intended to protect the buyer: they
> protect HUD.  Many homebuyers mistakenly believe that a HUD appraisal and
> subsequent inspection is a guarantee that the property is free from defects when,
> in fact, the appraisal only establishes the value of the property for mortgage
> insurance purposes.  Buyers need to secure their own home inspection through the
> services of a qualified inspector and satisfy themselves about the condition of the
> property.

(Doc. 93, Tab 6 at 4150.2 (5-1)-(5-2)).  The plaintiff has not introduced sufficient evidence

tending to show that ZRI breached its duty as an appraiser.[12]  As such, the court cannot conclude

that the defendant "specifically foresaw or should have foreseen" that Hardy would rely on its

appraisal.  *See Fisher*, 772 So. 2d at 462.  Because Hardy was not an intended user of the

appraisal, the defendant did not owe her a duty and summary judgment is due to be granted on

---

[12]In addition to the "intended use" clause in the HUD guidelines, ZRI's appraisal contains a clause, which states that "the intended use of the appraisal is to assist the client, as intended user of this report, in evaluating the subject property for lending purposes."

20

the plaintiff's negligence claim.[13]

### F.   NEGLIGENT SUPERVISION

In paragraph 32 of the plaintiff's negligence claim, she alleges that "ZRI negligently or recklessly hired, trained, and supervised . . . Zanaty" and that ZRI should have known of Zanaty's training and supervisory deficiencies because Zanaty "had been previously cautioned or reprimanded by the FHA on two (2) occasions for appraisal deficiencies that included at least one of the subject areas complained of in this action."  (Doc. 60 at ¶ 32).  To prove a claim of negligent supervision, the plaintiff must show both that the employee was incompetent and:

> affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge."  [*Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1002-03 (Ala. 1993)] (quoting *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983)).  Evidence of this actual or constructive knowledge may consist of specific acts of incompetency brought to the master's attention or a pattern of incompetent acts such that the character, frequency, and seriousness of the acts must have brought the incompetency to the master's attention in the exercise of due care.  *Id*.  A plaintiff must also show that the above breach of the employer's duty to reasonably supervise his or her employees proximately caused the plaintiff's injury.  *Keel v. Banach*, 624 So. 2d 1022, 1026 (Ala. 1993) (stating that there are four elements of negligence in Alabama: (1) a duty; (2) breach of the duty; (3) proximate cause; and (4) injury arising therefrom).

*Norman v. Southern Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1337 (M.D. Ala. 2002).

In support of her claim, the plaintiff asserts that "[a]t the time Mr. Zanaty performed the appraisal made the basis of this lawsuit, he had already been reviewed negatively by HUD for appraisals containing the same violations and inappropriate conduct by him as that alleged in this lawsuit.  A reasonable jury could infer that Zanaty Realty, Inc., failed to take any steps to

---

[13]Additionally, the court is still left with the fact that, by her own admission, Hardy never saw the appraisal that Zanaty prepared until after closing.  Thus, even if Hardy established that the defendants owed her a duty, she is still left with serious issues regarding proximate cause under the negligence claim.

supervise and correct Mr. Zanaty's conduct, and such failure caused injury to the plaintiff."

(Doc. 92 at p. 27).  On October 8, 2000, HUD notified Zanaty that one of his appraisals was

unacceptable.  (Doc. 93 at Tab 17).  However, the HUD Quality Assessment Scorecard is

addressed to Charles Zanity [sic] individually and there is no evidence before the court that ZRI

had any knowledge, actual or constructive, of the unacceptable rating.  Based upon the evidence

before the court, at the time Zanaty performed the appraisal on the property that Hardy bought,

HUD had only questioned the appraisal questioned in its October 8, 2000 letter.  As such, the

court cannot find that ZRI should be charged with knowledge of Zanaty's incompetency based

upon the character, frequency, and seriousness of his acts.  The defendants' motion for summary

judgment is due to be granted on the plaintiff's claims for negligent supervision against ZRI.

## G.   CIVIL CONSPIRACY

In Count III of the plaintiff's complaint, she alleges that Zanaty and ZRI joined in a civil

conspiracy with CMC, Flossie Manora, Dee Parks, and Tavares Williams to "conduct unlawful,

predatory, oppressive and/or immoral business activity" and that "[e]ach defendant was present,

encouraging, aiding, assisting, and/or abetting the business activity of the other and as such

condoned, facilitated and/or ratified the wrongful conduct afore-stated."  (Doc. 60 at ¶ 36).

Further, the plaintiff alleges that:

> 37.  The scheme to defraud on the part of siblings Dee Parks and Flossie Manora
> has existed for a number of years through several company name changes and is
> continuing in nature in that these defendants, or other close family members
> including siblings and spouses, recently changed company names to perpetuate
> their attempts to avoid legal liability while continuing to participate in predatory,
> fraudulent, oppressive and otherwise wrongful real estate and mortgage
> transactions primarily targeted at the elderly, economically challenged and/or
> otherwise disadvantaged consumers including the Plaintiff.
>
> 38.  In furtherance of the scheme and conspiracy to defraud Plaintiff, and

evidencing their agreement to participate in the conspiracy, ZRI and Zanaty made false, incomplete or inaccurate statements on their appraisal report and the Homebuyer Summary Form.  Said Defendants participated in several similar "land flip" transactions aiding and abetting these same co-defendants and in so doing, manifested a present and active intent to participate in the conspiracy to defraud Plaintiff and other similarly situated Jefferson County consumers.

(Doc. 60 at ¶¶ 37-38).

To prove a conspiracy, the plaintiff must first prove an underlying tort; if the underlying wrong proves no cause of action, then a conspiracy cannot exist.  *See Jones v. BP Oil Co.*, 632 So. 2d 435 (Ala. 1993) (quoting *Allied Supply Co. v. Brown*, 585 So. 2d 33 (Ala. 1991); *Webb v. Renfrow*, 453 So. 2d 724 (Ala. 1984).  The underlying tort the plaintiff alleges in the instant case is a scheme between Flossie Manora and Dee Parks to "participate in predatory, fraudulent, oppressive and otherwise wrongful real estate and mortgage transactions primarily targeted at the elderly, economically challenged and/or otherwise disadvantaged consumers including the Plaintiff."  (Doc. 60 at ¶ 37).  The court finds that the plaintiff has presented sufficient evidence from which a jury could conclude that an underlying tort exists.

After establishing the underlying tort, the plaintiff must prove that the defendant agreed with at least one other conspirator to accomplish an unlawful end and that it intended to have that unlawful end brought about.  *Fist Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996).  The court finds that the evidence presented in the instant case is sufficient to preclude summary judgment on the civil conspiracy claim.  Viewing the facts in a light most favorable to the plaintiff, the plaintiff's evidence shows that ZRI overvalued the Hardy property.  Additionally, the plaintiff has presented evidence that the defendant engaged in a similar scenario on at least two other occasions with CMC . . .  From those facts, the court finds that a jury could conclude that CMC, Dee Parks, and Tavares Williams were involved in an underlying

23

tort, that is fraud, and that ZRI participated in the conspiracy with an intent to advance the same. As such, the defendant's motion for summary judgment as it pertains to the civil conspiracy charge is due to be denied.

## H.   RICO CLAIMS

In her complaint, the plaintiff alleges violation of 18 U.S.C. § 1962(c) & (d).  The court will address each section separately below.

### a.  18 U.S.C. § 1962(c)

§ 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

According to the Eleventh Circuit Pattern Jury Instructions, in order for the plaintiff to establish that the defendants have violated Section 1962(c), she must prove the following seven elements:

(1) that the defendants associated with an "enterprise;"

(2) that the defendant knowingly committed at least two predicate acts;

(3) that the predicate acts formed a pattern by having the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics so that they were not isolated events;

(4) that the predicate acts amounted to, or threatened the likelihood of, continued criminal activity posing a threat of continuity projecting into the future;

(5) that through the commission of the two or more connected predicate acts, the defendants conducted or participated in the conduct of the affairs of the

24

enterprise;

(6) that the enterprise was engaged in, or that its activities affected, interstate commerce;

and

(7) that the plaintiff was injured in her property as a proximate result of the defendants'

commission of the pattern of racketeering activity.

**(1)      The Enterprise**

In the instant case, the plaintiff alleges that an enterprise made up of CMC, ZRI, Zanaty,

Dee Parks, Flossie Manora, and Tavares Williams existed

> to derive income and profits from the purchase, appraisal, and, re-sale of real
> property; and the origination, processing, and sale of HUD insured mortgages on
> those properties.  The enterprise centers around the flipping of over valued
> sub-par real estate financed with HUD insured mortgage loans.  The victims are
> typically uneducated, unsophisticated and/or economically disadvantaged
> members of the community and are proximately injured in their business and
> property by the racketeering activity that facilitates the enterprise.
>
> 48.  Consummation of the enterprise typically includes land flips, inflated
> appraisals, forged or doctored loan documents, violations of RESPA and TILA,
> "bait and switch tactics", [sic] promissory fraud, and misrepresentation or
> concealment of material terms and facts.  Predicate, overt, and/or criminal acts
> include mail and wire fraud, false representations to federal agencies, theft by
> deception, and tax evasion.

(Doc. 98 at pp. 12-13).  The defendants argue, however, that the plaintiff has failed to establish

that an enterprise existed at all.  (Doc. 98 at pp. 5-6).  Instead, they characterize the plaintiff's

complaints as "salesman said" disputes.

An "enterprise" is "any individual, partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity."  18

U.S.C.A. § 1961(4).  A RICO enterprise must be an ongoing organization in which the various

associates function as a continuing unit.  The enterprise cannot be the "pattern of racketeering

25

activity," but must be a separate entity from the activity in which it engages.  *See United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981).

To be "associated with" the enterprise means that the defendant must have some minimal contacts with the enterprise.  The Eleventh Circuit has stated "that the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (citing *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978).  For summary judgment purposes, the court finds that the plaintiff has established that the defendants were at least a loose association of individual entities, and therefore, the defendants were associated with the enterprise.

**(2)     Predicate Acts**

The plaintiff alleges that the defendants committed predicate acts of mail and wire fraud and false representations to federal agencies.[14]  (Doc. 60 at ¶ 48).  In support of her assertion, the plaintiff suggests that a jury could reasonably infer that information was transmitted through the mail and/or over wire in the process of obtaining the HUD loan.  Additionally, the plaintiff argues that she has made payments on the loan through the U.S. mail and Zanaty received a faxed assignment to perform the appraisal.  (Doc. 103 at p. 13).  The court finds it reasonable that a jury could conclude that the enterprise, as alleged, would have used the mail or wire to transfer information between the lender and CMC and that the plaintiff would make payments to the lender through the mail.  Additionally, the defendants can be liable for mail fraud even if

---

[14]18 U.S.C. § 1961(c) sets out the acts that constitute "predicate offenses" for RICO purposes.

26

they did not actually use the mail.  "The plaintiff does not need to prove that each defendant personally used the mails but only that the defendant acted 'with knowledge that the use of the mails will follow in the ordinary course of business, or [acted in circumstances] where such use can be reasonably foreseen.'  *United States v. Maze*, 414 U.S. 395, 399, 38 L. Ed. 2d 603, 94 S. Ct. 645 (1974)."  *Aetna Casualty Surety Co. v. P&B Autobody, et al.*, 43 F.3d 1546, 1560 (1st Cir. 1994).

### (3)    Pattern of Racketeering Activity/Continuity

The court must next determine whether the plaintiff has presented sufficient evidence by which a jury could conclude that the alleged predicate acts constituted a "pattern of racketeering activity."  The plaintiff alleges that:

> Defendants ZRI and Zanaty, as appraisers of the subject properties, are pivotal to the transactions including this transaction.  Typically, the loan amount, sales price, finance charges, and the entire profit of each transaction turns on the value assignment of the appraiser.  Where, as in this case, co-defendants Parks, Manora, Williams, and CMC are able to sell and finance a property held for a very short time at 310 % profit, excluding financing fees, the appraiser almost always, and certainly in this case, has omitted critical derogatory or necessary information from his report and/or has made false or incomplete representations including but not limited to his valuation opinion.  ZRI and Zanaty profit from their contributions to the enterprise *at least* through payments for each appraisal and an almost guaranteed stream of similar assignments as is demonstrated by the evidence in this case.

(Doc. 98 at ¶ 56).  The plaintiff further alleges that Zanaty engaged in a pattern of racketeering activity that included the following predicate acts:

> a.    By use of the U.S. Mail, Internet access, or by courier, Zanaty, shortly before performing his appraisal of the subject property received the job assignment from HUD and collected information for his work.  Subsequent to or during his work on this transaction Zanaty utilized the U.S. Mail to submit explanatory information about his results to CMC, HUD, and/or other lenders.  Said conduct violated § 18 U.S.C. 1341 (mail fraud) [sic].

27

b.      In the appraisal report prepared and submitted by Zanaty, he omitted or falsely represented the true present owner of the property and the prior sales history of the property.  He also omitted or falsely reported adverse limiting conditions as they existed in the property so as to disguise his inflated evaluation.  His conduct violated 18 U.S.C. § 1001 and 18 U.S.C. § 1010 and resulted in his sanction and termination from the HUD list of approved appraisers.

c.      Zanaty participated in at least two (2) other similar land flip transactions wherein closing funds from HUD insured mortgage loans were disbursed to co-defendants CMC, Parks, and Williams.  Said transactions are the subject of the *Yelling* and *Boware* lawsuits referenced above.

d.      The above racketeering predicates are directly related to the enterprise and scheme to defraud and they amount to or pose a continued threat of fraudulent or criminal activity.  Plaintiff was proximately injured in her business or property by said predicate acts.

e.      Plaintiff reasonably relied upon the competency and truthfulness of Zanaty as the "FHA appraiser" promised her by co-defendants Williams, CMC, and Parks, but were [sic] tricked and deceived through the use of deception and artifice into executing closing documents contrary to their agreement.

A "pattern of racketeering activity" requires "at least two acts of racketeering activity." *Johnson Enterprises of Jacksonville, Inc.*, 162 F.3d 1290 (11th Cir. 1998).  The plaintiff must also show evidence of "'continuity' sufficient to show that the predicate acts constitute a 'pattern' of racketeering activity, in addition to proof of at least two predicate acts." *Aetna Casualty Surety Co. v. P&B Autobody, et al.*, 43 F.3d 1546, 1561 (1st Cir. 1994), citing *United States v. Boylan*, 898 F.2d 230, 250 (1st Cir.).  To establish continuity, the plaintiff may show that the predicate acts "form a closed period of repeated conduct" or that they "are a regular way of conducting the enterprise." *Id.*  The plaintiff has presented sufficient evidence on which a jury could conclude that the loan documents submitted to HUD in this case as well as the other cases involving the same enterprise constitutes an ongoing succession of fraud such that this case satisfies the continuity requirement.

28

(4)     **Conducted or Participated in the Affairs of the Enterprise**

The Supreme Court has held that "conduct" requires "an element of direction" and "participate" requires "some part in that direction." *Reves v. Ernst & Young*, 507 U.S. 170, 178, 113 S. Ct. 1163, 1169, 122 L. Ed. 2d 525 (1993). Therefore, "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs," meaning that "one must participate in the operation or management of the enterprise itself." *Id*. at 179, 185.

A similar fact situation to the one in the instant case was addressed by the Eastern District of Pennsylvania in *Fidelity Federal Savings and Loan Association v. Felicetti*, 830 F. Supp. 257 (E.D. Pa. 1993). While that court's decision is not binding upon this court, the court finds its reasoning to be sound and instructive. In *Felicetti*, the plaintiffs alleged that the defendants violated RICO by preparing misleading and fraudulent real estate appraisals upon which the plaintiffs based their decisions to extend loans. *Id*. at 258-59. The court found that "even where the wrongdoers provide misleading or fraudulent information which significantly influences a major decision of the enterprise, this still does not constitute 'operation or management' of the enterprise in order for 1962(c) liability to attach." *Id*. at 259. In short, the court, likening the appraiser's conduct to the accountant's conduct in *Reves*, found that "the submission of misleading and fraudulent appraisals does not rise to the level of operating or managing [the enterprise]."

While the defendants may have been negligent in their preparation of the real estate appraisal at issue in this case, and may have even engaged in a pattern of racketeering activity, based upon the evidence before the court, the court cannot find that they participated in the

operation or management of the enterprise.  As such, the defendants are entitled to summary

judgment on the plaintiff's § 1962(c) claim.

**b.   18 U.S.C. § 1962(d)**

§ 1962(d) provides that it is unlawful to conspire to violate sections (a), (b), or (c) of the

RICO statute.  To prove a § 1962(d) claim, the plaintiff must show that the conspirators agreed

to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering

activity.  *United States v. Castro*, 89 F.3d 1443, 1451 (11th Cir. 1996).  The plaintiff may prove

the existence of an agreement by showing either that (1) the Zanaty defendants agreed to an

overall objective of the enterprise; or (2) the Zanaty defendants agreed personally to commit two

predicate acts.  *Id*.

The plaintiff may demonstrate that the defendants agreed to the overall objective of the

enterprise by "'circumstantial evidence showing that each defendant must necessarily have

known that others were also conspiring to participate in the same enterprise through a pattern of

racketeering activity.'"  *United States v. Starrett*, 55 F.3d 1525, 1544 (11th Cir. 1995), quoting

*U.S. v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991).  The plaintiff "'does not have to establish

that each conspirator explicitly agreed with every other conspirator to commit the substantive

RICO [offense] . . . or knew his fellow conspirators, or was aware of all the details of the

conspiracy.'"  *Id*. at 1544, quoting *United States v. Pepe*, 747 F.2d 632, 659 (11th Cir. 1984).

Furthermore, "a conspiracy may exist even if a conspirator does not agree to commit or facilitate

each and every part of the substantive offense."  *United States v. Salinas*, 522 U.S. 52, 63 (1997).

However, there must be evidence that the defendants were aware of the essential nature and

scope of the enterprise and that they intended to participate in it.  *Baumer v. Pachl*, 8 F.3d 1341,

1346 (9th Cir. 1993).

The court has already found that a jury could conclude that the defendants engaged in a pattern of racketeering activity with the other members of the enterprise as alleged by the plaintiff.  The court likewise finds it reasonable that a jury could conclude that the defendants knew that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.  As such, the defendants' motion for summary judgment, as it pertains to the plaintiff's 18 U.S.C. § 1962(d) claim, is due to be denied.

## I.    Aiding and Abetting Claim

Lastly, the plaintiff alleges that, at the very least, the defendants aided and abetted RICO acts.  Both parties agree that *Cox v. Administrator U.S. Steel and Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994), establishes the basic elements of aiding and abetting a RICO violation to be: (1) that the defendant was generally aware of his role as part of the overall improper activity; and (2) that the defendant knowingly and substantially assisted the principal violation.

The evidence before the court is sufficient for a jury to conclude that the defendants were aware of their role in the overall improper activity - - Tavares Williams testified that Zanaty would call him and tell him what needed to be fixed before he would complete an appraisal; Zanaty overlooked defects in the house and used improper comparables in an effort to raise the value of the house; and he valued the house well above the selling price without explaining why. Based on these, and other examples put forth in the record, a jury could reasonable conclude that that the defendants were aware of their role in the overall improper activity.

Likewise, based upon that same evidence, the jury could conclude that the defendants knowingly and substantially assisted the principal violation.  Viewing the facts in a light most

favorable to the plaintiff, the court cannot conclude that the plaintiff's aiding and abetting claim is proper for summary judgment. Therefore, the defendants' motion is due to be denied as it pertains to that claim.

## CONCLUSION

Based upon the foregoing, the court finds that the defendants' motions for summary judgment are due to be denied in part and granted in part. The plaintiff's state law claims of negligence, fraud, and civil conspiracy against Zanaty, individually, are dismissed as they are barred by the statute of limitations. Additionally, to the extent the defendants seek summary judgment on the breach of contract, fraud, negligence, negligent supervision, and 18 U.S.C. § 1962(c) claims, the motion is due to be granted. However, to the extent the defendants seek summary judgment on the plaintiff's civil conspiracy, 18 U.S.C. § 1962(d), and aider and abettor claims, the motion is due to be denied. An order to that effect will be entered contemporaneously herewith.

**DONE** this the 6th day of June, 2005.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge